No. 30,751.

HELMERICH & PAYNE, INC., *Appellee*, v. ROXANA PETROLEUM CORPORATION, *Appellant*.

(14 P. 2d 663.)

Opinion filed October 8, 1932.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts*, all of Arkansas City, and *O. E. Swan*, of Muskogee, Okla., for the appellant.

*E. J. Taggart, John Bradley*, both of Wellington, *A. W. Hershberger*, of Wichita, *W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham*, all of Arkansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to determine interests in the proceeds of oil produced under a lease of lots in a block in the city of Oxford. The producing well was in the west half of the block. At the time the well was commenced the city had an ordinance prohibiting the drilling of more than one well in a block, and providing for distribution of a share of oil produced among lot owners not permitted to drill. The owner of the lots comprising the east half of the block was denied participation in the proceeds, and appeals.

Lots 1 to 6, inclusive, comprising the east half of block 85, were owned by Kaighn, the appellant. Lots 7 to 12, inclusive, comprising the west half of the block, were owned by Wartick, except that the west 50 feet of lots 10, 11 and 12 were owned by Jenkins, who is not interested in the litigation. Wartick leased to Goff, who assigned to Shawver, and for the purpose of the decision, Wartick and Shawver may be regarded as having the interests of lessor and lessee.

The lease was made in 1923, and contained the following grant by the lessor:

"Has granted, demised, leased and let, and by these presents does grant, demise, lease and let unto the said lessee, for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations and structures thereon to produce, save and take care of said products, all that certain tract of land situate in the county of Sumner, state of Kansas, described as follows, to wit: [Describing Wartick's lots and parts of lots.]"

The lessee covenanted as follows:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises."

Underlying the city and adjoining territory was a vast deposit of oil. Various producers commenced to extract the mineral. The ruthlessness with which development of oil-producing land is prosecuted is a matter of common knowledge, and in such cases some regulation is necessary to prevent devastation of governmental, social and property interests of the city and its inhabitants.

The city enacted an ordinance which took effect on June 20, 1927, and which was supplemented by an ordinance which took effect on August 3, 1927. The ordinance provided that no well should be drilled without a permit granted by the city. A permit was to be issued on an application of prescribed form and content and accompanied by certain documents. The applicant was also required to furnish a bond to the city for the benefit of the city and others interested, that if the permit were granted the applicant would comply with the terms and conditions of the ordinance in the drilling and operation of the well, and would pay to the city, and to any owners of land in the block upon which the applicant did not hold oil leases, a royalty as in the ordinance provided.

The ordinance contained the following provisions:

"That within the boundaries set forth in section 1 of this ordinance, there

shall be only one permit issued for one well in each block, except that where more than one producing oil or gas sand shall be found in such block, a permit may be granted for one- well to each of such sands in each block, and that with such exception it shall be unlawful to drill more than one oil or gas well in a block,

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"That in case a permit for the drilling of a well be issued to a person, persons, or corporation not holding oil and gas leases or drilling contracts with the owners of all the lots in the blocks, it shall be a condition of the permit that the permittee, its successors and assigns, shall deliver to the credit of each of such owners whose land shall not be under lease free of cost in the pipe line to which the well may be connected, a share of all oil produced and saved from such well equal to one-eighth of the proportion of the whole production that the square feet of ground so owned bears to the square feet contained in such block exclusive of the streets and alleys. . . .

"That neither this ordinance nor any permit issued hereunder shall be interpreted to grant any right or license to the permittee to enter upon or occupy in any respect in the drilling or production operations any land except by the written consent of the owner; nor shall it limit or prevent the free right of any lot owner to contract for the amount of royalty to be paid with respect to his own land, or for damages, rights or privileges with respect thereto."

- The ordinance also contained a provision that a lessee of lots in a block other than the sole permittee, or the owner of unleased lots in the block, might share proportionately in the well, by electing to pay to the permittee the proportionate part of the total cost and expense of drilling and operating the well, and securing such payment by bond.

On July 3, 1927, the lessee made proper application, accompanied by bond, for a permit to drill on lots 8 and 9 in block 85. The permit was granted on August 7. After that the lessee commenced to drill, and a well was completed which produced oil from November 1, 1927, to August 13, 1929. Kaighn did not lease the east half of the block or any part of it, and no well was drilled on his part of the block.

The lease in question reserved to the lessor one-eighth of all oil produced. That left seven-eighths to the lessee. The ordinance provided it should not limit the free right of a lessor to contract for the amount of royalty to be paid with respect to his own land. This provision related to division between lessor and lessee of apportionable production, and not to source or quantity of oil to be divided. In this instance, the lessor's royalty is one-eighth, the same

as if the ordinance had not been enacted. The section was not intended to secure to a lessor on whose lots the single well provided for by the ordinance is drilled, the stipulated royalty, say one-eighth, computed upon oil drained by the well from lots the lessor did not own, and upon which the owner was prevented from drilling.

The lessor contends his lease gave him one-eighth of all oil produced by a well which his lessee drilled on the leased premises, even although the oil produced included oil drained from the one-half block belonging to Kaighn, who was prevented from drilling; that as to the lessor the contract controls, and the ordinance does not apply; that as to the lessee, the contract controls as between him and the lessor, but the ordinance controls in all other respects; that if Kaighn is to participate in production, the lessee must pay Kaighn out of the lessee's seven-eighths, and that as a consequence, Kaighn's remedy is on the lessee's bond given when the lessee secured the permit to drill. In support of this contention it is said the lessee complied with the ordinance, used the lease to procure a permit to drill, gave bond to pay Kaighn, and by utilizing the ordinance secured certain financial advantages, such as relief from drilling offset wells.

The lessor's interpretation of the ordinance is manifestly unsound. It would be queer if the ordinance did not affect the lessor at all, but did apply to the lessee. That the ordinance did not do this is demonstrated by the provision authorizing other lessees, and owners of unleased lots, to tie into the well and become part owners of it with the permittee-lessee, by bearing proportionate shares of the cost of drilling and expense of operating the well. Both lessee and lessor were obliged to accept the situation resulting from enactment of the ordinance, and the lessee used the lease to obtain a permit, not merely for his own benefit, but also for the purpose of securing to the lessor whatever accrued to the lessor under the ordinance.

The ordinance applied to production of oil from block 85, and other blocks in the city. It took account of the equal right of all lot owners to tap the pool beneath the city; it checks the mad rush to get not only the oil beneath a lessor's land, but as much as possible of the oil beneath the land of other owners, and stopped the confounding of confusion in the city by eliminating wasteful necessity of drilling offset wells; and it in effect secured to every lot owner in a block the customary lessor's royalty on that proportion of the oil

beneath the block which the surface area of his part of the block bore to the surface area of the block.

It is contended that if the ordinance be interpreted as indicated, it violated rights protected by the due process and obligation of contract provisions of the constitution of the United States.

The ordinance was passed pursuant to power conferred by statute to grant permits to mine coal, oil or gas within the city limits, under such restrictions as would protect public and private property (R. S. 12-106), and under statutory power to enact ordinances for the peace, good order and welfare of the city. (Laws 1925, ch. 123; R. S. 1930 Supp. 15-440.) The ordinance was upheld in the case of *Marrs v. City of Oxford*, 24 F. 2d 541 (opinion by McDermott, district judge). The decision was affirmed in the case of *Marrs v. City of Oxford*, 32 F. 2d 134 (opinion by Lewis, circuit judge), and a rehearing was denied. This court is satisfied with the decision in the Marrs case, which has the sanction of the supreme court of the United States, certiorari having been denied (280 U. S. 573), and the court holds the ordinance to be constitutionally valid.

In the Marrs case the lease involved was made after the ordinance was passed, and the decision did not discuss the effect of the ordinance on leases already in existence. In this case the lease antedated the ordinance, but development had not begun. The evils attending development which the ordinance sought to prevent were precisely the same in one case as the other, and the regulatory provisions of the ordinance applied to the lease in question. Indeed, development was commenced pursuant to the ordinance.

The parties now interested in the fund in controversy have stipulated concerning its distribution in the event this court should hold Kaighn is entitled to participate. The court holds Kaighn is entitled to participate.

The judgment of the district court is reversed, and the cause is remanded with direction to distribute the fund in controversy pursuant to stipulation of the interested parties.

HARVEY, J., dissenting.