DOBSON *v.* OIL AND GAS COMMISSION OF THE STATE OF ARKANSAS.

4-9312                                    235 S. W. 2d 33

Opinion delivered December 18, 1950.

Rehearing denied January 22, 1951.

*Arnold & Arnold,* for appellant.

*Ike Murry,* Attorney General, *Francis W. Wilson,* Assistant Attorney General, *Forrest M. Darrough, Joseph A. Gill, Davis & Allen* and *Gaughan, McClellan & Gaughan,* for appellee.

GEORGE ROSE SMITH, J. The basic question in this case is whether our statutes empower the Oil and Gas Commission to compel the unitization of an entire oil and gas field. An area is said to be unitized when various ownerships are treated as a unit in the production of oil and gas. In the usual case the owners of several small contiguous tracts, totaling perhaps forty acres, agree that a single well shall be drilled in the unitized area and that all the owners shall share proportionately in the oil and gas, regardless of whose land happens to be the situs of the well. In this case the principle of unitization has been carried a good deal farther. The Commission has ordered that all wells in the McKamie-Patton field, which comprises over 5,000 acres, shall be developed by a single operator as if there were only one lessor and one lessee. Under this order the numerous royalty owners receive a specified proportionate part of the entire field's production, no matter how much or how little oil or gas is produced from their individual lands. The court below upheld the Commission's power to unitize the field and acccordingly decreed that the appellants' royalties should be computed on the basis of the unitization order rather than on the basis of the oil and gas actually withdrawn from their lands.

There is no real dispute about the facts that led to the Commission's decision to unitize the McKamie-Patton field. The discovery well in this field was completed as a producer in 1940. During the next few years drilling operations throughout the field established the character and boundaries of the producing formation. The pool is a long ellipse, with deposits of oil in a narrow continuous band around the perimeter. Inside this band of oil is a large concentration of wet gas which originally furnished the drive that forced the oil to the surface. Outside the band of oil is a layer of salt water, but its inward pressure has never been great enough to drive the oil upward.

At first the oil wells in the field were satisfactory producers, as the gas pressure was sufficiently strong to force the oil to the surface. There were also gas wells drawing gas from the pocket within the perimeter of oil. But it was soon determined that the subterranean gas pressure was falling with dangerous rapidity. We need not detail the extensive proof that was taken below to show that conservation measures were urgently needed. It is enough to say that millions of barrels of oil and billions of cubic feet of gas would have been lost forever unless the decline in underground pressure could be arrested.

There were two factors leading to the drop in underground gas pressure. First, the producing gas wells were drawing off gas and thus diminishing the expansive force of the gas pocket. Second, the oil wells were also draining off quantities of gas that came to the surface intermixed with oil. The science of conservation indicated that gas should be reinjected into the gas pocket to preserve the subterranean pressure. This meant that the operators of gas wells would have to be content to separate the butane and other distillates in the wet gas and return the dry gas to the earth, while the operators of oil wells would likewise be required to separate the oil and reinject the remaining gas.

It is obvious that these measures could be adopted only if the field were operated as a unit. A person owning a producing gas well could not be expected to agree

that his salable dry gas should be put back into the ground merely to provide his neighbor with the pressure needed to operate his oil well. Nor would the owner of an oil well forego the sale of marketable gas unless he could expect to benefit from that action.

By 1947 the operators (as distinguished from the royalty owners) were attempting to achieve field-wide unitization on a voluntary basis. An elaborate contract was prepared by which all the operators and royalty owners were to agree that the whole field would be developed as if there were only one lessor and one lessee. The oil and gas deposits underlying each tract were estimated as accurately as possible, and each royalty owner was assigned a percentage interest in the production of the whole field, regardless of the amount of oil or gas that might be produced from the particular well in which he had an interest.

. As might have been expected, not everyone was willing to sign the agreement. It was executed by 97% of the operators and by 75% of the royalty owners, but the appellants and others refused to join in the plan, preferring to develop their acreage independently. These appellants own the mineral interest in a forty-acre tract and had previously joined their neighbors in voluntarily forming a 160-acre drilling unit on which there is a producing oil well. The other royalty owners in this drilling unit agreed to the field-wide unitization contract, but the appellants refused to sign it.

In October of 1948 the operators who had unsuccessfully attempted to unitize the field by voluntary action applied to the Commission for an order compelling unitization. Their petition recited that 97% of the operators and 75% of the royalty owners had agreed to the plan. After a hearing the Commission ordered that the field be unitized pursuant to the plan outlined in the proposed contract. Other operators and royalty owners later agreed to the order, so that by the time this case was tried the contract had been signed by all the operators and by 96% of the royalty owners.

Under the unitization plan these appellants were assigned an interest of .003004% of the total oil and gas produced in the field. Their grievance is that their royalties from the oil well on their drilling unit would, at least up to the date of trial, greatly exceed the sums allotted them under unitization. During the first year after the Commission's order became effective the appellants would have been entitled to royalties of $9,562.59 on the oil produced from their well. But under the unitization order their share amounts to only $2,789.45. The company that had been named to operate the entire field tendered checks for the appellants' share under the plan, but the appellants declined the tenders and brought this suit to collect from their own lessee the royalties on their share of the oil and gas actually produced from their drilling unit. The chancellor, sustaining the validity of the Commission's order, refused to grant the relief prayed.

At the trial much testimony was taken to show that in the long run forced unitization will benefit both the public and the royalty owners in the field. This evidence shows pretty conclusively that over a period of years this method of developing the pool will avert a substantial waste of mineral resources and will ultimately provide a greater return to operators and royalty owners alike. But such testimony manifestly goes only to the wisdom of legislation authorizing compulsory unitization or to the issue of constitutionality if such a statute were enacted. When the question is merely one of interpretation such evidence is of little value to the courts unless the statute contains some ambiguity that may be clarified by proof of the possible effects of the law.

The pertinent acts are collected as Chapter 1 of Title 53, Ark. Stats. 1947. We are unable to find in this chapter any provision empowering the Commission to compel the unitization of an entire pool, no matter how desirable that course may be. It is true that § 53-110 sweepingly prohibits the waste of oil or gas, but it does not follow that the General Assembly has thereby undertaken to delegate to the Commission the power to impose any

means of waste prevention that it may choose. On the contrary, § 53-111 includes a detailed enumeration of the measures to be used by the Commission in attaining the goal of conservation. Subsection *I* of this section permits the Commission to regulate secondary recovery methods, such as the reinjection of gas, but this subsection cannot fairly be construed to mean that the Commission can require a resort to secondary recovery methods against the wishes of those who own the pool.

This construction has also been placed upon our statutes by Robert E. Hardwicke, a recognized authority in the field of oil and gas law. In an article entitled "Oil Conservation: Statutes, Administration, and Court Review," 13 Miss. L. Journal 381 (1941), Mr. Hardwicke wrote: "No state has yet passed a law authorizing the regulatory body to *require* unit operations." Among the statutes considered and cited by the author in making this statement are the ones we are now construing.

The appellees candidly admit that there is nothing in our legislation to authorize compulsory unitization when that procedure is opposed by a majority of the operators and royalty owners. But, it is argued, the power does exist when "a substantial majority" of the interested persons agree to the plan. Section 53-115 (*C*) is relied on to support this contention. But all that subsection does is to declare that *voluntary* unitization agreements shall not be held to violate our statutes relating to trusts, monopolies, etc. We find no language in this subsection or elsewhere to indicate that a petition signed by a substantial majority of those concerned confers on the Commission any greater power than that conferred by a petition signed by only a small minority. We think it clear that the legislature has not yet undertaken to empower the Commission to direct the unitization of an entire field.

Nor may the courts achieve this result without statutory authority. That contention was made and rejected in *Western Gulf Oil Co.* v. *Superior Oil Co.*, 92 Calif. App. 299, 206 P. 2d 944. There the operators in part of an oil field had incurred great expense in installing equipment

for the reinjection of gas. Operators in other parts of the field refused to contribute to this expense, although it was conceded that the increased gas pressure resulting from reinjection would enable the non-assenting operators to recover a greater part of the oil deposits underlying their own holdings than would otherwise have been possible. The court held that in the absence of statute it was without authority to compel the defendants to join in the plan or to bear any part of the cost. With that view we agree. Almost any improvement a man makes on his own land is likely to make that of his neighbor either more or less valuable. But, with a notable exception involving nuisances, the courts have never undertaken to require payment for such incidental benefits or to award compensation for such incidental damage. We conclude that at present the goal of field-wide unitization can be reached only by voluntary coöperation.

This conclusion necessitates the consideration of two more questions. The first concerns the amount of oil and gas on which the appellants can require their lessee to pay royalties. Before the effective date of the unitization order the Commission had fixed the maximum daily production for each oil well in the field. The allowed production for the appellants' well, known as Wheat Unit No. 1, was 250 barrels daily. But under the unitization plan the Commission merely set a blanket allowance for the entire pool, leaving the operator free to decide which wells should be used as output wells. Some of the wells were used for the reinjection of gas, and we were told in the oral argument that some less efficient producing wells were plugged. It happened that Wheat Unit No. 1 was selected as an output well, the reinjected gas being used to drive oil upward through this well. Consequently, the daily output of the appellants' drilling unit has risen from the original allowance of 250 barrels to about 312 barrels a day during the first year of the unitization operations. The appellants insist that since their lease provides for a royalty on all the oil and gas produced from their drilling unit they are entitled to be paid on the basis of the increased production that has resulted from unitization, even though they have not joined in the plan.

We deem this contention unsound. If the appellants had been the sole owners of Wheat Unit No. 1, and if the Commission had undertaken to unitize only the rest of the field, no doubt this well would have continued to operate under a restriction upon production. But the other owners of the drilling unit joined in the unitization contract, and as a result of their coöperation the well has been used solely for production. There is no equity in the appellants' insistence that they should share in the fruits of unitization while being relieved of its burdens, those burdens being an immediate reduction in royalties for the sake of greater returns over a period of years.

The relationship of the co-owners in a drilling unit is at least analogous to that of tenants in common. What the appellants' co-owners have done is to enhance the immediate value of the common property at a sacrifice to themselves. This situation may be likened to that in which one cotenant makes improvements without the consent of the others. Such a tenant will be given the benefit of his improvements upon partition, either by a division awarding him the improved area or by an allowance of a larger share in the proceeds of sale. *Dunavant* v. *Fields,* 68 Ark. 534, 60 S. W. 420.

The conservation statutes confirm this view. Section 53-114 (*D*) declares that "a producer's just and equitable share of the oil and gas in the pool . . . is that part of the authorized production for the pool . . . which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained." Here the appellants seek to obtain more than their "just and equitable share" by levying a toll upon oil and gas that pass through Wheat Unit No. 1 only because the operator of the unitized field has selected it as an output well. Their effort must fail. The appellants' royalties should be based on that part of the production from Wheat Unit No. 1 that is determined by the Commission to constitute a withdrawal from the tracts making up the drilling unit

in which the appellants have an interest. On the basis of this record the appellants' royalties are to be computed on a daily production of 250 barrels of oil for the period up to the date of trial and thereafter until the Commission fixes some greater or lesser amount in order to assure the appellants of their just and equitable share of the pool. Of course all other royalties on minerals passing through Wheat Unit No. 1 should be paid into the common fund that is to be distributed among the royalty owners bound by the unitization agreement.

Second, the appellants contend that the purchaser of the oil produced from their well should be required to pay them treble the amount of their royalties, under § 53-514. We hardly think this section applies to the present situation. In substance it provides that an operator who conspires with the purchaser to obtain more than his share of the production shall forfeit his leasehold interest, and that a purchaser participating in such a transaction shall forfeit treble the value of the royalty. Here there is nothing even resembling a conspiracy; the lessee and the purchaser have simply acted upon the assumption that the unitization order bound the appellants. That the purchasing company was mistaken in this assumption does not make it liable for a penalty, especially in a court of equity. See *Turner* v. *Smith,* 217 Ark. 441, 231 S. W. 2d 110.

The decree is reversed and the cause remanded for the determination of the amount of the appellants' royalties. Up to the entry of the final decree these royalties will be computed under the Commission's order restricting the production of Wheat Unit No. 1 to 250 barrels a day. Thereafter the Commission, after notice and a hearing, may vary this allowance in order to provide the appellants with no more or less than their fair share of the pool, but without imposing upon them any part of the cost of the reinjection operations.

We do not pass upon the question of whether the payments of back royalty to the appellants should bear interest, that being a matter for the chancellor to decide in the first instance.