**REPUBLIC NATURAL GAS CO. v. BAKER.**

No. 4403.

United States Court of Appeals
Tenth Circuit.

May 14, 1952.

Rehearing Denied June 11, 1952.

Huxman, Circuit Judge, dissented.

Malcom Miller, Wichita, Kan. (George Siefkin, George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter and Robert C. Foulston, Jr., all of Wichita, Kan., on the brief), for appellant.

Dale M. Stucky, Wichita, Kan. (A. E. Kramer, Hugoton, Kan., Howard T. Fleeson, Homer V. Gooing, Wayne Coulson and Paul R. Kitch, all of Wichita, Kan., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Abstractly stated, the question presented by this appeal is whether, under Kansas law, the owner or owners of mineral interests under separate tracts of land covered by one oil and gas lease, are entitled to participate pro rata in the royalty from a well drilled on one of the tracts; or whether, as the trial court held, the owner or owners of the mineral interest under the separate tract on which the well was drilled are entitled to all of the royalties from such well. The question is presented on these facts.

In 1930, T. G. Hicks and wife executed an oil and gas lease to the Argus Production Company on 640 acres of land in Township 34, Range 39 West of the 6th P. M., Stevens County, Kansas. In conventional form, the lease provided for the payment to the lessor a royalty of ⅛th of the gas produced from each well and used off the premises. Thereafter the lessors executed to Parker an instrument entitled "Sale of Oil and Gas Royalty", by the terms of which they conveyed an undivided one-half interest in all the oil, gas and

minerals under one of the quarter sections covered by the oil and gas lease. The conveyance was expressly made subject to the terms of the lease, "but covers and includes one-half of all the oil royalty, and gas rental or royalty due and to be paid under the terms of said lease." Soon thereafter, appellant, Republic Natural Gas Company, as assignee of the lease, completed a gas well on the quarter section in which Parker held his mineral interest, and from that date until October 1, 1948, Republic recognized the owners of the mineral interest under this quarter section as entitled to all of the royalties from the oil and gas produced from this well under the lease. In 1938, appellee, E. V. Baker, became the owner of 4/5ths of Parker's interest, or 2/5ths of 1/8th of the royalty. When Republic ceased to pay the royalties, claiming that Baker was entitled to be paid on a basis of 1/10th instead of 2/5ths of the 1/8th royalty, Baker brought this suit against it to compel the payment of the royalties on the basis of his undivided mineral interest under the quarter section where the well was located. The case was removed to federal court on diversity of citizenship and requisite amount in controversy, both of which are admittedly present.

■ Republic freely concedes here, as it did in the trial court, the applicability of the rule of capture in Kansas, to the effect that absent an express covenant or supervening valid regulations, the owner of mineral interests under a portion of land subject to an oil and gas lease is entitled to all of the rents and royalties accruing from the production of oil or gas from that land, even though the lease may cover other tracts. See Carlock v. Krug, 151 Kan. 407, 99 P.2d 858. The underlying reason for the rule is that the conveyance of a separate mineral estate carries with it the exclusive right to the oil and gas produced therefrom, the owners of which cannot be divested simply because the lease covers other undeveloped tracts of land. Summers Oil & Gas, Vol. 3, Sections 608–609, pp. 517–534. The resulting hardships from this rule prompted the so-called "entirety clause", now in most Mid-Continent oil and gas leases, under the terms of which it is agreed that in the event the mineral interest under the leased premises shall be separately owned, the royalties shall nevertheless be treated as an entirety, the separate owners participating pro rata. See Carlock v. Krug, supra.

■ For purposes of this appeal at least, both parties apparently concede the indivisibility of the lessee's covenant to drill and develop. That is to say, Republic has neither the express nor implied obligation under the lease to drill additional wells on the lease. The sole basis of this appeal is that the Kansas Corporation Commission's basic proration order, applicable to the Hugoton Gas Field, where this lease is located, has the effect of bringing about communitization of the royalty interest under this lease by necessary implication.

This basic order, promulgated March 21, 1944, in pursuance of the Kansas Conservation Laws, 55–701 and 55–703, General Statutes of Kansas 1949, and effective the following April 1st, provided in regulatory detail for the orderly development and production of natural gas in the Hugoton Field to prevent physical and economic waste, and to protect the correlative rights of the parties owning an interest in the common source of supply. Among other things, the Commission found that the Hugoton Field in Kansas was about 65 miles long and 40 miles wide, in which 168 of the wells were located on 640-acre tracts, while 84 were located on 160-acre tracts; that although the Field was underlaid with different gas-producing formations, they were all interconnected to constitute one common source of supply, so that the production from one well in the Field would theoretically deplete the whole reservoir. It found that by reason of pressure deferentials or gradients, there was a disproportionate production from the wells and leases in the Field, thus impairing the correlative rights of many of the owners of developed leases. The avowed purpose of the order was to adopt a formula which would enable each well to currently produce its allowable and ultimately produce the amount of gas underlying the lease upon which it was located. The Commission found that one completed well in the formation could adequately and

sufficiently drain 640 acres without causing waste, and for the purpose of arriving at a proration formula, the acreage factor for each well was declared to be "equal in num-. ber of acres held by production from the said well divided by 640"; and the term "held by production" was construed to mean that acreage which "participates in the production upon a royalty basis and does not receive delay rentals." In no instance. should more than 640 acres be attributable to a well for the purpose of calculating the acreage factor, except "as hereinafter specifically provided."

It was further pertinently provided that the producers and owners of gas wells completed prior to January 30, 1940; who also possessed the right to produce natural gas from other lands and leases under the order, might attribute such lands and lease, not exceeding 640 acres, to a unit for production thereunder for a term not exceeding one year from the date of the order; provided that within such period the owner or producer should file with the Conservation Director, satisfactory evidence that the owners of the minerals had become participants in the royalty payments as otherwise thereinafter required; provided further that any such land not unitized within the prescribed period for the purpose of sharing the royalties from the wells should be excluded as a part of the production unit.

The order also contained a provision for compulsory unitization of land or minerals owned by two or more persons so as to consolidate their holdings into one production unit. But that provision was subsequently stricken by the Commission's amendatory order of January 10, 1946. Based upon acreage, deliverability, and other relevant proration factors, the order provided a formula for determining the allowable production for each well in the Field. To avoid drilling unnecessary wells, and to prevent waste, the order also provided that no well drilled after the effective date of the order should be assigned an allowable unless the Commission first found that there was undue and uncompensated drainage occurring beneath the tract on which the well was drilled, or that there

was an actual need for additional wells to fulfill market demands.

Contemporaneously with the effective date of the basic order, Republic filed a plat with the Director of Conservation, defining the 640-acre tract covered by the original lease and the location of the gas well thereon. On the plat was a certification "that the acreage shown thereon is held by royalty from the well of Republic Natural Gas Company located and identified hereon." And, since April 1, 1944, Republic has been granted an allowable from the well drilled upon the lease in question based on the plat and certificate. None of the royalty owners under the lease had notice of the filing of the plat or the certification, nor have they consented to the unitization of the 640 acres as a production unit or agreed to apportion the production of the well on any basis. Instead, the royalty owners under the 160 acres where the well is located have received payment for all of the royalty from the production of the well until payments were withheld on October 1, 1948, resulting in this lawsuit.

Republic's argument is that the Corporation Commission's order had the effect of establishing 640-acre production units; that although the Commission did not expressly forbid the drilling of more than one well on a 640-acre lease, it had the legal effect of doing so, and inherent in that restriction was the requirement that the owners of land under the lease must be paid their pro rata share of the gas produced therefrom, no matter where the well through which the gas comes to the surface is located. In no other way, says Republic, can the correlative rights of the parties be safeguarded and the salient purposes of the order effectuated.

In the determination of our specific question, we assume the contitutional power of Kansas to regulate the production of oil and gas so as to prevent waste, and to secure equitable apportionment among the owners of the migratory oil and gas underlying a common source of supply. See Hunter Co. v. McHugh, 320 U.S. 222, 227, 64 S.Ct. 19, 88 L.Ed. 5, and cases cited. And, we assume that the Commission's basic order of April 1, 1944, is a valid and appropriate

exercise of that asserted power. We may also assume without discussion or decision that Kansas may, in the exercise of its police power, appropriately provide for the compulsory unitization of property rights in a common source of supply of oil and gas, or in a unit of production within such common source of supply. Such power has been asserted and sustained in other states. See Act No. 225 of La.Laws of 1936; Act No. 157 of La.Laws of 1940, LSA–R.S. 30:1 et seq.; Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495; Placid Oil Co. v. North Central Texas Oil Co., 206 La. 693, 19 So.2d 616; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Alston v. So. Production Co., 207 La. 370, 21 So.2d 383; Crichton v. Lee, 209 La. 561, 25 So.2d 229; 52 Okl.Stat.Supp. §§ 287.1–287.15; and see Palmer Oil Corp. v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997.

While Kansas has not empowered its Corporation Commission to impose involuntary communitization of leaseholds or unitization of mineral rights in a common source of supply, it has upheld the power of a city to enact an ordinance having that effect. Helmerich & Payne v. Roxana Petroleum Corp., 136 Kan. 254, 14 P.2d 663; Marrs v. City of Oxford, 8 Cir., 32 F.2d 134. But, in all cases we have seen where involuntary unitization has been sustained, the power to effectuate it has been explicit and exercised only after notice and opportunity to be heard. Indeed, wherever the power has not been expressly conferred, courts have consistently denied it to regulatory tribunals, and have refrained from exercising it as a judicial function. See Dobson v. Arkansas Oil & Gas Commission, 218 Ark. 160, 235 S.W.2d 33; Smith Petroleum Co. v. Van Mourik, 302 Mich. 131, 4 N.W.2d 495; Mueller v. Sutherland, Tex. Civ.App., 179 S.W.2d 801; Dillon v. Holcomb, 5 Cir., 110 F.2d 610; Bruce v. Ohio Oil Co., 10 Cir., 169 F.2d 709.

■ One of the avowed objectives of the basic order was to safeguard the correlative rights of parties owning an interest in a common source of supply. Indeed, the achievement of that objective was essential to the validity of the order. But the Commission did not propose to achieve this objective by involuntary unitization of royalty interests. In its amendatory order of January 10, 1946, it expressly disclaimed any such power and authority, expressing the view that "such far-reaching power should * * * be exercised only upon express legislative investment." And, to further clarify the legal import of its basic order, it went on to say that "there is no prohibition either by the said order or by law against drilling a well upon acreage less than the 640-acre unit found in the order by the Commission to be most economical and advantageous." From this interpretation of its own order, it is manifest that the Commission intended to safeguard the correlative and co-equal rights of the royalty owners in the common supply, not by forced unitization, but by the establishment of production units in which the "owners of the minerals have become participants in the royalty payments." This production unit was established and the allowable granted on the representation that the interested mineral owners would become participants in the royalty payments—a prerequisite to the protection of correlative rights. If, therefore, the creation of the production unit failed to accomplish its purpose because all of the mineral owners did not become participants in the royalty payments, the remedy is not compulsory unitization as a legal consequence of its deficiencies, but a re-examination of the facts upon which the production unit was established and the allowable granted. The law does not imply a power in the regulatory bodies or the courts to take the property of one party and give it to another in order to effectuate a just result.

We agree with the trial court that the basic order does not have the effect of unitizing the royalty interests, and the judgment is affirmed.

HUXMAN, Circuit Judge (dissenting).

To me the question seems somewhat different than as stated in the majority opinion. I would state the problem as follows: After the execution of a single oil and gas lease covering a 640 acre tract, does the subsequent sale and assignment of mineral interest by the lessor in separate parts of

the tract deprive the Corporation Commission of power under the Kansas Conservation Law to fix an allowable for a single well that will not only conserve the common source of supply of gas, but will also protect the correlative rights of all those who now have an interest, by assignments from the lessor, in the gas being produced from different parts of the tract.

I am not ready to say that Kansas has not empowered its Corporation Commission to impose involuntary unitization on separately owned tracts. However, in my view, it is not necessary to consider whether this is the intent and purpose of the Kansas law. The first general order by the Corporation Commission contained a provision for involuntary unitization. This was subsequently eliminated. But because the Commission eliminated this provision from the basic order does not determine that the law does not contemplate such power, if necessary, to effectuate the double purpose of the law of preventing waste, provide for ratable taking and protect the correlative rights of all interested parties. Apparently, the Kansas Supreme Court has not been called upon to consider this question.

We are not dealing here with separately owned gas leasehold estates nor with mineral interests whose consent to an oil and gas lease was necessary at the time the lease was executed. We are dealing with one unit of production of 640 acres, covered by a single oil and gas lease.

If we view the picture as of the date of the execution of the lease, the Corporation Commission's order carried out the mandate of the conservation law. In fixing the allowable for this well, the Commission considered the 640 acre tract as a production unit held under a single lease. It took into consideration the rights of the unit to production from the common pool with respect to other like units of production. It also took into consideration the fact that gas was being produced from the entire tract through the one well on the Southeast Quarter. It fixed an allowable based upon production from the entire tract and in an amount which would return to the lessor and the lessee their fair share of gas re-covered from the entire tract. Hicks could not have demanded that Republic drill other wells. No drainage was taking place. The conservation law took from Hicks his right to demand the drilling of additional wells, under the theory that a lessor has a right not only to be protected from drainage, but also has the right to demand full development of the entire tract in an orderly and expeditious manner. The intent and effect, indeed the purpose, of the allowable fixed for this well was to return to Republic its fair share of production from the 640 acres with respect to surrounding tracts and to return to the interested royalty holders (in this case Hicks) his share of royalty production from the entire tract.

Had Hicks remained the owner of the entire royalty interest, he would have received the royalty resulting from the production from the entire tract. When subsequent to the execution of the lease he assigned royalty interest in severalty under different parts of the unit, his assignees stepped into his shoes and acquired all his rights against the lessee.

The royalty holders have only such rights under the one lease as their assignor had. We are not dealing with separate tracts or separate royalty interests in the sense that the holders thereof must execute oil and gas leases. These royalties all stem from Hicks' interest retained by him under the lease. To hold that the Corporation Commission may not consider this 640 acre tract covered by one valid lease as a unit of production and protect the correlative rights of the lessor and the lessee, as well as those who come in by assignment, from either of them is to deprive the Commission of all power to carry out the policy of the conservation statute looking to the elimination of waste, unnecessary and wasteful drilling of innumerable wells and yet protect the correlative rights of all interested parties.

What would be the situation if after the execution of this lease Hicks had assigned royalty interests in 10 acre tracts to 64 different persons? What kind of an allowable could the Corporation Commission fix for this one well that would protect Republic's rights as well as the rights of Hicks

and his assignees? Would it grant an allowable to 64 wells? If so, how would that affect Republic's rights under the lease? Or, would it fix an allowable based upon a consideration of only the 10 acre tract on which the well was located and thus drastically reduce the amount of gas Republic was entitled to produce from this well under the covenants of its lease, or would it fix an allowable based upon the 640 acre tract and permit the fortunate one on whose 10 acre tract the well was located to drain and receive all the gas from the remaining 630 acres?

It is not as stated in the majority opinion a question of "power in the regulatory bodies or the courts to take the property of one party and give it to another". It is rather a question whether the conservation statute does not give the Corporation Commission power to fix an allowable sufficiently large so as to not only return to the royalty holder on whose acreage the well is located the gas which comes from his acreage, but also permit gas from the other acreage covered by the same lease to flow through this well and permit the royalty holders thereof to receive that which comes from their land. How can such an order be said to invade the property rights of any one. The allowable in this case was based upon the production of gas from the property of all the interested parties. Republic's position simply is that in conformity with the spirit and intent of the allowable, as fixed by the Commission, it should pay this royalty to those from whose property it came. Baker does not contend that the allowable fixed in this case contemplates production from his acreage alone or that as a royalty holder under the Southeast Quarter only he is entitled to an allowable for the well, based upon a consideration of production from the entire tract. In his brief he states that "Basically, Baker's position is that he is not concerned with the amount of production from the well. If it is entitled to only a 160 acre allowable, that is a situation about which he does not complain. It is a matter for the attention of the Commission." That might do very well if his interest was the only one entitled to consideration, but under the law it was the Commission's duty to consider the correlative rights of all parties who have an interest under the lease. Baker may not insist even if this contention is to be given serious consideration that Republic be cut down to an allowable of 1/4 of what it is entitled to produce under the lease with Hicks, so that he coming in under Hicks, after the execution of the lease, may deprive the other royalty holders from receiving through this one well the gas coming from their acreage. This was what the Kansas Gas Conservation Law sought to remedy. To this extent at least, in my opinion, it modified the harsh law of the tooth and the claw as announced in Carlock v. Krug, 151 Kan. 407, 99 P.2d 858, and kindred cases.